DOCKET NO. 342

BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

IN RE URANIUM INDUSTRY ANTITRUST LITIGATION

ORDER CHANGING CAPTION OF LITIGATION

In an effort to more accurately discribe the above-referenced litigation,

IT IS ORDERED that all document filed in this litigation hereafter will bear the following caption:

IN RE URANIUM INDUSTRY ANTITRUST LITIGATION

FOR THE PANEL:

Patricia D. Howard
Clerk of the Panel

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION
FILED

JUL 31 1978

PATRICIA D. HOWARD
CLERK OF THE PANEL

BEFORE THE JUDICIAL PANEL
ON
MULTIDISTRICT LITIGATION

IN RE URANIUM INDUSTRY          )          DOCKET NO. 342
ANTITRUST LITIGATION            )

EDWARD WEINFELD, JUDGE OF THE PANEL, WITH WHOM
ROY W. HARPER, JUDGE OF THE PANEL, JOINS (concurring
in part and dissenting in part):


     I concur in the decision of my brethren that the three TVA

actions should be centralized in a single district pursuant to

28 U.S.C. §1407 for coordinated or consolidated pretrial pro-

ceedings. I dissent, however, from that part of the opinion

which includes the Illinois action in coordinated or consoli-

dated pretrial proceedings with the three TVA actions. I would

allow the three TVA actions to proceed in coordinated or

consolidated pretrial proceedings separate from the Illinois

action in a district other than the Northern District of

Illinois.

     The interests of Westinghouse and TVA are antagonistic in

MDL-235 (uranium contract actions) and in MDL-342 (uranium

conspiracy actions). In the uranium contract actions, one of

which has been brought by TVA, several utility companies allege

that Westinghouse breached its contractual obligations for the

present and/or future delivery of uranium to fuel nuclear power

plants. Westinghouse has pled as its defense in these actions
that full performance of its contractual obligations for the
supply of uranium became "commercially impracticable" by reason
of unforeseen developments and that Westinghouse was according-
ly excused from such performance by reason of Section 2-615 of
the Uniform Commercial Code. One of the principal unforeseen
developments that Westinghouse has raised during pretrial and
the ongoing trial of those actions has been the alleged illegal
conspiracy among foreign and domestic uranium producers to
manipulate the price and availability of uranium, which is also
the basis of the Illinois action now before the Panel.
Westinghouse asserts that proof of this conspiracy might
establish its defense in the uranium contract actions and also
entitle Westinghouse to relief in the Illinois uranium con-
spiracy action. To expect Westinghouse and TVA to cooperate
effectively in attempting to prove a conspiracy that Westing-
house is asserting as a defense to the uranium contract claims
instituted by TVA is unrealistic. The views of Westinghouse
and TVA concerning the focus and effects of this alleged
conspiracy are clearly in substantial conflict.

The counterclaims which have been filed in the Illinois
action add a further dimension of complexity to the already
labyrinthian proceedings in that action. The numerous issues

raised by those counterclaims do not involve any interests of TVA.
They will entangle the litigants in a variety of disputes
concerning the propriety of Westinghouse's marketing practices
with respect to nuclear reactors and fuel supplies for
nuclear reactors.  For example, Gulf Oil Corporation (Gulf),
one of the counterclaimants, charges that Westinghouse
attempted to eliminate from the market a competing nuclear reactor
designed and manufactured by Gulf.  Specifically, Gulf
alleges that Westinghouse (1) refused to supply to Gulf
at reasonable prices electric generators to be used in
Gulf's nuclear reactor system, (2) unfairly disparaged the
design of the nuclear reactor system marketed by Gulf, (3)
submitted unreasonably low bids for nuclear reactor systems
while at the same time deliberately concealing substantial
financial losses on nuclear business, and (4) sold at
commercially unmatchable prices supplies of uranium which
Westinghouse did not have in its possession as part of a
total package in which Westinghouse's nuclear reactor
systems were also sold.

Furthermore, pretrial proceedings in the Illinois
action have been delayed substantially during the resolution
of the motions to disqualify Westinghouse's original counsel
in that action.  Westinghouse's substitute counsel stated

during oral argument before the Panel that Westinghouse
will press for retention of its initial counsel because
that counsel is extremely knowledgeable about Westinghouse's
position in this litigation and Westinghouse will save
time and money by not having to reeducate new counsel.
Therefore,  further delay of pretrial progress in the
Illinois action is likely.

In light of these circumstances, I do not believe
that coordinated  or consolidated pretrial proceedings
between the Illinois uranium conspiracy action and the
three TVA uranium conspiracy actions would serve the convenience
of the parties and witnesses or promote the just and efficient
conduct of the litigation.  Moreover, TVA is an arm of the
federal government that serves the public interest and it
should not be caught in the crossfire of the conflicting
positions of the private litigants.  TVA is simply attempting
to recover damages for injuries it allegedly suffered in
connection with the uranium supply contracts specifically
enumerated in the TVA complaints and as a result of defendants'
alleged breach of certain duties owed to TVA under the
Tennessee Valley Authority Act of 1933.  These interests
should not be submerged by the extensive claims and counter-
claims that are inherent in the various Westinghouse contro-
veries with other litigants.  I am thus of the view that

the TVA actions will be able to proceed toward trial more expeditiously if they are allowed to proceed separately from the Illinois action in a district other than the Northern District of Illinois.

BEFORE THE JUDICIAL PANEL
ON
MULTIDISTRICT LITIGATION

IN RE URANIUM INDUSTRY ANTITRUST   )
LITIGATION                          )
                                    )
Homestake Mining Corp. v. Enerdyne  )
Corp., D. New Mexico,               )
C.A. No. 77-609 P                   )        DOCKET NO. 342
                                    )

FEB 27 1979

PATRICIA B. HOWARD
CLERK OF THE PANEL

2/27/79

OPINION AND ORDER

BEFORE MURRAY I. GURFEIN, CHAIRMAN, AND EDWIN A. ROBSON,
STANLEY A. WEIGEL, ANDREW A. CAFFREY, ROY W. HARPER, AND
CHARLES R. WEINER, JUDGES OF THE PANEL.

PER CURIAM

I.   BACKGROUND

A.   The Actions In The Transferee District

On July 31, 1978, the Panel, pursuant to 28 U.S.C.

§1407, transferred three actions (the TVA actions) to the

Northern District of Illinois and, with the consent of that

court, assigned them to the Honorable Prentice H. Marshall

for coordinated or consolidated pretrial proceedings with

a fourth action (Rio Algom) already pending there.  In re

Uranium Industry Antitrust Litigation, 458 F. Supp. 1223

(J.P.M.L. 1978).  These four actions involve an alleged

conspiracy to increase the price of uranium and to divide

portions of the world uranium market.

The complaints in the TVA actions contain virtually

identical allegations, but the defendants are different.

Ten foreign and three domestic companies allegedly engaged in

various aspects of the uranium business are named as defendants.

The named defendants in each action are listed as co-conspirators in the other actions. In each complaint in the TVA actions, TVA alleges, inter alia, that beginning in 1972, the defendants and their co-conspirators, in violation of Sections 1 and/or 8 of the Sherman Act, conspired to rig bids, to fix the price, terms and conditions for the sale of uranium, and to allocate uranium sales in foreign and domestic markets.

Rio Algom was filed by Westinghouse Electric Corporation (Westinghouse) against twelve foreign and seventeen domestic companies (including Homestake Mining Company) alleged to be producers, sellers, or agents for sellers of uranium.1/ The complaint in this action alleges that, beginning in 1972, the defendants formed an international cartel that fixed and increased the price of uranium to purchasers within the United States; allocated the sale of uranium; boycotted certain uranium purchasers; and otherwise eliminated competition among the defendants. Westinghouse claims that these activities violated Sections 1 and/or 8 of the Sherman Act.

---

1/ The district court in the Northern District of Illinois found some of the foreign defendants in default for failing to file answers to Westinghouse's complaint. Final default judgments as to liability recently were entered against these defendants.

In the Panel's earlier opinion in this litigation, the Panel found that

> these four actions share numerous complex factual questions concerning, <u>inter alia</u>, whether there was a domestic and/or international conspiracy in the uranium industry; and if there was, who participated in the conspiracy; what the purposes of the conspiracy were; how the participants attempted to effectuate those purposes; and what the actual effects of the conspiracy were.
>
> . . . .
>
> ... [Thus]· [t]he crux of these actions is the allegation of a domestic and/or foreign conspiracy in the uranium industry. Centralization of the Illinois and TVA actions is necessary to prevent duplication in the extensive and difficult discovery expected on this key issue.

<u>Id</u>. at 1229-30.

On September 26, 1978, Judge Marshall entered an order coordinating for pretrial purposes the TVA actions and <u>Rio Algom</u>. Earlier, Judge Marshall had approved a discovery schedule which basically provides that depositions on the merits in this coordinated litigation were to commence in January 1979. This schedule also establishes a trial date in September 1980.

B.   <u>Homestake Mining Company's Earlier Action</u>

The Panel has previously considered the question of whether to include in <u>In re Westinghouse Electric Corporation Uranium Contracts Litigation</u> (MDL-235) an action brought by Homestake Mining Co., which is also the plaintiff in the action now before the Panel, against Westinghouse (this action will be referred to as <u>Homestake I</u>). In the Panel's original opinion in MDL-235, the Panel, pursuant to Section 1407, had centralized several actions involving uranium

- 4 -

supply contracts between Westinghouse and a number of utility
companies, including TVA, in the Eastern District of Virginia
for coordinated or consolidated pretrial proceedings.   In
re Westinghouse Electric Corporation Uranium Contracts Liti-
gation, 405 F. Supp. 316 (J.P.M.L. 1975).   Homestake I involved
the rights and obligations of Homestake and Westinghouse
under a 1974 contract by which Homestake agreed to sell
700,000 pounds of uranium to Westinghouse.   This contract
stated that the source of this uranium would be a contract
between Homestake and a French corporation, Uranex, and
that Homestake would have no liability to Westinghouse should
Uranex fail to make delivery.   After Uranex allegedly informed
Homestake that Uranex was unable or unwilling to deliver
the uranium under their contract, Homestake filed Homestake
I against Westinghouse, seeking declaratory and injunctive
relief.   Basically, Homestake sought a declaration that,
because of Uranex's failure or refusal to perform its contract
with Homestake,  Homestake's obligation to deliver uranium
to Westinghouse was terminated.   Westinghouse counterclaimed
against Homestake in this action for breach of contract
and unjust enrichment.   In addition, Westinghouse raised
the defense of "unclean hands" against Homestake,[2] alleging
that Homestake participated in the antitrust conspiracy
alleged in Westinghouse's complaint in Rio Algom.

---

[2]    Homestake has advised the Panel that Westinghouse has
withdrawn this defense in Homestake I.

The Panel declined to include Homestake I in MDL-235,
holding, inter alia, that:

> although Westinghouse's 'unclean hands' defense
> in Homestake [I] may share questions of fact
> with Westinghouse's defense in the actions in
> MDL-235 concerning the allegedly international
> conspiracy, the issues in Homestake [I] are
> basically unique to that action because they
> involve the contractual relationships between
> Westinghouse and Homestake as well as Homestake
> and Uranex.

In re Westinghouse Electric Corporation Uranium Contracts
                                                      4/
Litigation, 436 F. Supp. 990, 995 (J.P.M.L. 1977).

    C.   The Action Now Before the Panel

    The action presently before the Panel (Homestake II) arises
out of a 1970 agreement between Homestake and Enerdyne Corporation
(Enerdyne) whereby Homestake became the assignee of most of
Enerdyne's interests under, and the lessee of, certain unpatented
mining claims concerning uranium properties located in New Mexico.
In September 1977, Homestake filed Homestake II in the District of
New Mexico against Enerdyne, seeking a declaration that Homestake's
obligations under that agreement had been fully satisfied.  Shortly
                                                       5/
thereafter, Enerdyne filed its answer and counterclaims.   The
counterclaims assert certain breaches of implied covenants,

---

3/    The Panel also found that inclusion of Rio Algom in MDL-235
was inappropriate.  In re Westinghouse Electric Corporation
Uranium Contracts Litigation, 436 F. Supp. 990, 994-96 (J.P.M.L.
1977).
4/    See further discussion of why Homestake I was not included
in MDL-235 at pages 13-14, supra.
5/    Although Enerdyne's pleading is captioned as a "counter-
claim," Enerdyne itself acknowledges in its papers before the
Panel that its "counterclaim" actually raises numerous counter-
claims.

conditions and duties under the 1970 agreement; misrepresentation by Homestake; lack of good faith, fraud and deceit; constructive fraud; or breach of fiduciary duty. One of Enerdyne's counterclaims also alleges that Homestake conspired with "other uranium producers," in violation of the federal antitrust laws and the antitrust laws of New Mexico, to restrain trade and commerce in uranium. Enerdyne claims that this alleged conspiracy lead Homestake to breach its contractual commitments to Enerdyne.[6]

On September 8, 1978, the district court ordered that all dis-covery in this action must be completed on or before March 1, 1979. Homestake and Enerdyne have both represented to the Panel, however, that only minimal discovery concerning the antitrust counterclaim has yet occurred in Homestake II. No trial date has yet been established in this action.

---

[6]   Enerdyne's antitrust counterclaim is stated in §§15, 20 and 21 of its "first amended counterclaim," as follows:

15. At times acting independently and at times acting in concert, collusion, and conspiracy with other uranium producers, Homestake had deliberately refused to proceed diligently to develop and mine the subject properties, in an effort to withhold uranium from the market and drive up its prices.

20. Homestake has used the Homestake agreement to withhold and delay production of uranium, in violation of §§49-1-2, and 49-1-3, N.M.S.A. (1953 Comp.) [The New Mexico Antitrust Laws].

21. Homestake has used the Homestake agreement to withhold and delay production of uranium, in violation of 15 U.S.C. §1, 15 U.S.C. §2, and 15 U.S.C. §3.

- 7 -

## II.  PROCEEDINGS BEFORE THE PANEL

Homestake has moved the Panel, pursuant to 28 U.S.C. §1407, to transfer the antitrust counterclaim in Homestake II to the Northern District of Illinois for coordinated or consolidated pretrial proceedings with the four actions already pending there.  Enerdyne and Westinghouse oppose this motion.  No other parties have responded to Homestake's motion.

## III.  DECISION OF THE PANEL

We find that the antitrust counterclaim in Homestake II shares questions of fact with the four actions in the transferee district and that inclusion of that counterclaim in the Section 1407 proceedings pending there will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation.

Enerdyne contends that the legal and factual issues in Homestake II all arise from the contractual relationship between Homestake and Enerdyne.  Each of these issues relates to  1) the negotiations between Enerdyne and Homestake which resulted in the execution of the 1970 agreement between those parties; 2) the nature of the duties imposed upon Homestake by that agreement; and 3) the reasons for the alleged breach by Homestake of its duties under the agreement, Enerdyne asserts.  Enerdyne contends that its antitrust counterclaim falls into the last of these categories, because the activities alleged in that counterclaim tend to show

why Homestake failed to produce uranium from the mining
properties covered by the 1970 agreement.  While the antitrust
counterclaim may share some questions of fact with the actions
in the transferee district, Enerdyne argues, that counterclaim
is merely one element in a complex contractual dispute whose
resolution will turn primarily upon New Mexico state law
dealing with mining obligations and the interpretation of
contracts.  Enerdyne maintains that its antitrust counterclaim
can be most easily understood and most efficiently litigated
in the context of that particular contractual dispute.

Westinghouse agrees with Enerdyne that Homestake II
basically involves a contractual dispute between Homestake
and Enerdyne.  Westinghouse further argues that its interpre-
tation of the allegations of the antitrust counterclaim
and discovery to date in Homestake II "indicate[s] that
any conspiracy alleged therein is substantially and factually
distinct from that alleged in either [Rio Algom] or the
TVA actions...."  Westinghouse points out that the properties
subject to the 1970 agreement between Homestake and Enerdyne
are located solely in New Mexico, and that the conspiracy
involved in the actions in the transferee district allegedly
began in 1972, two years after the agreement between Homestake
and Enerdyne was entered into.  Westinghouse thus asserts
that discovery in the transferee district concerning an
alleged antitrust conspiracy will involve a plethora of
factual questions not raised by Enerdyne's antitrust counter-
claim, and that discovery on these issues in the transferee

district will dwarf any possible discovery in Homestake II.

Westinghouse also objects to the inclusion of Enerdyne's antitrust counterclaim in the coordinated or consolidated pretrial proceedings pending in Chicago on the grounds that such a transfer would complicate and delay both Homestake II and those coordinated pretrial proceedings. Westinghouse points out that the antitrust counterclaim, unlike Rio Algom or the TVA actions, involves claims under Section 2 of the Sherman Act, and contends that therefore discovery proceedings concerning that counterclaim will involve numerous unique factual inquiries. In addition, Westinghouse maintains that bifurcating Homestake II by trans-ferring the antitrust counterclaim to Chicago and leaving the rest of that action in New Mexico is an inefficient manner by which to process that action. To the extent that discovery in Homestake II and the coordinated proceedings may overlap, Westinghouse suggests that, inter alia, voluntary cooperation among the parties would be sufficient to accomplish the goals of Section 1407 transfer.

Finally, both Westinghouse and Enerdyne claim that the Panel's determination that Homestake I should not be included in MDL-235, In re Westinghouse Electric Corporation Uranium Contract Litigation, supra, 436 F. Supp. at 495, serves as a precedent for denying Homestake's present motion.

The issues in the antitrust counterclaim in <u>Homestake II</u> are
"basically unique" to the contractual relationship between
Homestake and Enerdyne, Enerdyne and Westinghouse argue, and
that counterclaim should not be included in the coordinated
pretrial proceedings in the transferee district merely because
"of a surface similarity presented by one element of a compli-
cated local contract dispute."

We find these arguments unconvincing. While the bare alle-
gations of Enerdyne's antitrust counterclaim are not as detailed
as the allegations of the complaints in <u>Rio Algom</u> or the TVA
actions, the record before us amply demonstrates that the antitrust
counterclaim in <u>Homestake II</u> and the actions already in the trans-
feree district share numerous complex factual questions concerning
whether there was a conspiracy in the uranium industry; and if
there was, whether Homestake participated in the conspiracy; what
the purposes of the conspiracy were; and what the actual effects
of the conspiracy were. For example, at a deposition conducted
in <u>Homestake II</u>, counsel for Enerdyne explained the relevance
of a particular question as follows:

> The allegations in the Chicago action allege certain
> violations of the United States Antitrust Laws and
> claim that Homestake did conspire with other uranium
> companies to violate those laws. We have similiar
> allegations against Homestake in this action.

And in responding to an interrogatory propounded by Homestake,
Enerdyne stated:

> Enerdyne believes the decision by Homestake to restrict
> the production of uranium from the subject properties
> was made as part of a conspiracy with Uranex, a foreign
> cartel company [which is named as a defendant in one
> of the TVA actions and as a co-conspirator in the remaining
> two TVA actions and <u>Rio Algom</u>] and perhaps other companies.

Also see Transcript at 3-5.

- 11 -

In addition, it is clear that Enerdyne's allegations in the antitrust counterclaim that "Homestake had deliberately refused to proceed diligently to develop and mine the subject properties, in an effort to withhold uranium from the market and drive up its prices" directly parallels factual issues already raised in the transferee district.  In a recent opinion, the  Court of Appeals for the Seventh Circuit reversed a decision of the transferee judge in which the judge had refused to disqualify a law firm that represented one of the defendants in the transferee district.  The Seventh Circuit held in part as follows:

> The lower court erred...in identifying the issues raised by an allegation of price fixing.... The lower court found that the 'heart of the [Westinghouse] complaint is directed at alleged price-fixing arrangements.' 448 F. Supp. at 1312.  However, an agreement to restrict the production of uranium unquestionably is a price fixing arrangement.  'Price fixing' is a characterization which extends to all conspiracies designed to manipulate the price of goods.  [Citations omitted].  In fact, all serious attempts to establish a supracompetitive price must necessarily include an agreement to restrict output.  Otherwise the monopoly price could never be maintained.  Thus, the lower court's view that conspiracy to fix prices and conspiracy to restrict output are distinct offenses is in error.  The lower court's reliance on the fact that the complaint contains only a 'few scanty references to the alleged conspiratorial control of uranium production' is misplaced.5/  448 F. Supp. at 1312.  Westinghouse's general allegation of price fixing is sufficient to make evidence tending to establish a conspiracy to restrict uranium production relevant to the litigation.

---

5/  The district court cites only a portion of the complaint's references to the constraint issue, e.g., paragraphs 36, 39(b) and 46.  The complaint... also raises the issue twice in the introduction as well as paragraphs 41(d), 43 and 55(a).  Further, Westinghouse continued to raise supply curtailment issues in the course of the litigation in its answer to interrogatories.

<u>Westinghouse Electric Corporation v. Gulf Oil Corporation</u>,
558 F.2d 221, 226 (7th Cir. 1978).

    We acknowledge that <u>Homestake II</u> concerns in great
part a contractual dispute between Homestake and Enerdyne.
Nevertheless, we agree with Homestake, the movant before us,
that Enerdyne's antitrust counterclaim should be severed
from the remaining claims and counterclaims in <u>Homestake</u>
<u>II</u> and transferred to the Northern District of Illinois.
In fact, even Enerdyne states in its papers before the Panel
that "[i]f transfer is deemed necessary... because of common
antitrust issues, the antitrust claims can and should be
severed from the other claims stated by the counterclaim."
Thus, we are of the view that transfer of only the antitrust
counterclaim

        is necessary to prevent duplicative discovery, eliminate
        any possibility of conflicting pretrial rulings and
        conserve time and effort for the parties, the witnesses
        and the judiciary.  Discovery on any issues unique
        to any action, group of actions or party may be scheduled
        by the transferee judge to proceed in a separate discovery
        schedule concurrently with discovery on common issues.
        See In re Corrugated Container Antitrust Litigation,
        447 F. Supp. 468, 471 (J.P.M.L. 1978).

<u>In re Uranium Industy Antitrust Litigation</u>, <u>supra</u>, 458 F.
Supp. at 1229.

Inclusion at this time of the antitrust counterclaim
in the Section 1407 proceedings now being conducted in the
transferee district is particularly appropriate because Judge
Marshall has already had an opportunity to become uniquely
acquainted with all facets of the discovery and other pretrial
proceedings concerning the alleged uranium conspiracy.  We
are confident that Judge Marshall, with the assistance and
cooperation of the parties and counsel, will be able smoothly
to integrate Enerdyne's antitrust counterclaim into the
pretrial proceedings in the transferee district.  See id.
at 1231-32; Manual for Complex Litigation, Parts I & II,
§§3.11 (rev. ed. 1977).  Moreover, this result is manifestly
preferable to Westinghouse's suggested alternative of volun-
tary cooperation among the parties.[7/]  Should the antitrust
counterclaim become ready for trial or otherwise ready for
remand because the transferee judge finds that the Section
1407 proceedings pertaining to the counterclaim are completed,
the transferee judge may suggest to the Panel that the Panel
remand the counterclaim to its transferor court.  28 U.S.C.
§1407(a); Rule 11(c)(ii), R.P.J.P.M.L., 78 F.R.D. 561, 569
(1978).  See, e.g., In re A. H. Robins Co., Inc. "Dalkon
Shield" IUD Products Liability Litigation, 453 F. Supp. 108
(J.P.M.L. 1978).

---

[7/]    We note that neither Homestake nor Enerdyne has urged
that voluntary cooperation is a suitable alternative to
Section 1407 transfer.

- 14 -

We discern no inconsistency between our determination
concerning the antitrust counterclaim in Homestake II and
our earlier decision not to include Homestake I in MDL-235.
In our MDL-235 decision, we declined to transfer either
Rio Algom or Homestake I to the Eastern District of Virginia,
even though both of those actions raised issues concerning
an alleged conspiracy in the uranium industry.  In re Westing-
house Electric Corporation Uranium Contract Litigation,
supra, 436 F. Supp. at 992-93, 995.  In denying transfer
of Rio Algom, for example, we recognized that "the allegations
of a price-fixing and market manipulation conspiracy in
Rio Algom and the actions in MDL-235 involve common questions
of fact," but we held that "on the basis of the record before
us we are not convinced that these conspiracy issues predominate
over the contractual issues that form the basis of MDL-235."
Id. at 995.  The primary reason for our decision not to
include either Rio Algom or Homestake I in MDL-235, however,
was that, unlike those two actions, trial was imminent in
the actions in MDL-235,[8/] and we therefore found that "the
purposes of Section 1407 [could] best be achieved by allowing
the actions in MDL-235 to be left alone.  [Citation omitted.]"

---

[8/]   On October 27, 1978, the transferee judge in MDL-235
found, after a trial limited to issues of liability, that
Westinghouse had wrongfully breached its contracts with
some of the utility plaintiffs.

Id. at 996.  That situation is far removed from the one
now before us, where trial for any action that will be
tried in the Northern District of Illinois is not presently
scheduled to commence until September 1980.  Finally, as
we have already stated, in the present litigation, unlike
MDL-235, the common core of factual issues springs from
the alleged existence of a conspiracy in the uranium industry,
and we are transferring to the Northern District of Illinois only
that portion of Homestake II which raises these common questions
of fact.

        IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C.
§1407, the action captioned Homestake Mining Corp. v. Enerdyne
Corp., D. New Mexico, C.A. No. 77-609 P, be, and the same
hereby is, transferred to the Northern District of Illinois
and, with the consent of that court, assigned to the Honorable
Prentice H. Marshall for coordinated or consolidated pretrial
proceedings with the actions already pending there.

        IT IS FURTHER ORDERED that, pursuant to 28 U.S.C. §1407(a),
all claims and counterclaims in this action except the antitrust
counterclaim be, and the same hereby are, separated and
remanded to the District of New Mexico for further proceedings.